Good afternoon, Your Honors. If it pleases the Court, my name is Gary Montana. I'm here on behalf of the appellants in this matter. That's a very fortunate name given the Chief Judge's home. I'm here on behalf of the appellants that are members of the Picayune Rancheria of Techansee Indians. It's our belief in this case that the lower court erred due to the fact that there were numerous court hearings that were held at the tribal court level going all the way back to 2013 that settled the intertribal dispute. And even though those cases were brought out to the lower court judge, they were not addressed. So it's our position that based on the case law and also several BIA rulings, or even the BIA ruling in this case, which indicated the BIA does not have authority to recognize permanently any tribal government during an intertribal dispute, but only for 638 contract purposes. The IBA reiterated that when they upheld the recognition by the BIA, saying that their decision should not be construed in any manner as a determination on the ability of the 2010 council to exercise the tribe's obligations. Even though the lower court was made aware of these decisions that decided the intertribal dispute, and these cases at the tribal court were mainly primarily against banks that were releasing money to a faction that was less than a quorum under the Constitution. Under their Constitution, it requires seven people. So the Breakaway Faction was down in Fresno and only had three members and were absconding with millions of dollars of the tribe's money. So in the RoboBank case as well as the case involving Yosemite Bank, the court held that distinguished who the exact tribal governing body was. It said the Ayala Faction of the Tribal Council consisting of Nancy Ayala, Tracy Birchwell, Karen Winn, and Charles Sargosa can establish a quorum of the Tribal Council under Article VI, Section 2 of the Constitution. The Lewis Faction, which was down in Fresno and broke away, consisting of Reggie Lewis, Chance Alberta, and Carl Bushman cannot establish a quorum under the Constitution, Article VI, Section 2. And then it went on. The appellees, the State of California as well as the council for what is termed the new council, never raised the issue of whether or not the tribal court was illegal or was not legally established at the lower court, although on appeal they've seemed to argue that the tribal court was not legally sanctioned. As well, the State of California and the appellees have argued that reference to the new tribal council and the lower court's decision, the permanent injunction, somehow was not recognition of who was in the leadership position of the tribe. But the lower court's decision that the new tribal council should be recognized clearly was an act that indicated that they were recognizing the new tribal council as the governing body. There's nothing in this court's case law or any case law that says a federal court or a state court or the BIA or the IBIA, the Interior Board of Indian Appeals, has the ability to recognize any tribal government, permanent tribal government, when there's an intertribal dispute involved. You know, I just don't quite read the court's order as doing that. The district court was presented with a request for an injunction because there had been some public health and safety issues concerning the casino, and it is true that in parts of the decision the court in passing said some of these things, but the judgment doesn't change anything with regard to the tribal leadership, does it? Yes, it does. It recognizes the new tribal council, and it gave them what they feel is the ability to carry on what we call unconstitutional elections. There was a tribal court ruling that said their election in October, I think it was October 3, 2015, was illegal and unconstitutional for various reasons. Well, that's a construction by the tribal council, but that's not in the opinion, is it? That was the tribal court that ordered that. I mean, if tribes are not allowed through their inherent sovereignty and their ability to be self-governing to decide these intertribal disputes, then what are we going to do? I mean, this tribe has been embroiled in an intertribal dispute for 10 years. There's still factions out there that are vying for control of the tribe. However, they're not in control of the money, basically the casino. And this decision, if you read through the decision, clearly outlines the fact that the lower court judge, Judge O'Neill, recognized the new tribal council, and based on that recognition, he allowed things to go forward, including the opening of the casino. That's clearly contrary to law. The Teshiba case, Teshimba case, Shoshone case, out of the Ninth Circuit, is clearly distinguishable because that case, there was no tribal court. In this case, there was a tribal court. In fact, the original tribal court was established in 2012, pursuant to Resolution 1245, and it was passed by the Lewis faction. They're the ones who broke away. So the court rulings at the lower court clearly were a continuation of the faction that broke away. So I just don't see how the court cannot respectfully, I'm requesting that it be remanded and that the instructions from the tribal court be followed by Judge O'Neill. Do you want to reserve the rest for rebuttal? Yes, sir. Very good. Good afternoon, Your Honors. Bill Torengren, Deputy Attorney General on behalf of the State of California. In this particular case, or actually, I'm splitting my time with the — with James Coquando this afternoon, and he's here on behalf of the current tribal council. The district court's judgment and permanent injunction should be affirmed. The order dealt with the tribe's breach of the compact by failing to ensure public safety. I just heard argument to the effect that the decision allowed the opening of the casino. Actually, what happened in reviewing the decision, the decision allowed the casino to be reopened upon the lifting of the closure order by the NIGC, the National Indian Gaming Commission. That meant that a Federal agency was involved in negotiations with a faction to reopen the casino. The order that the judge entered, one, allowed reopening if the NIGC lifted the order, and, two, imposed restrictions on the tribe, not on any particular group in the conflict. Well, counsel, counsel's — opposing counsel's argument is that Judge O'Neill's treatment, one of these disparate factions, and conferred upon them the elevated status which allowed them to then control, as he puts it, the money, which is the casino. And you're arguing something different. I am arguing something totally different in that Judge O'Neill's order does not determine who gets to open the casino. Judge O'Neill's order says when the NIGC lifts its order, then the casino can be opened. The NIGC, relying on the BIA, is making the decision about who is going to operate the casino,  Judge O'Neill did not make that decision at all. And, in fact, going back to the injunction, the injunction is restrictions on the tribe itself, not on any faction, like I said before. And, additionally, the injunction covers any group claiming to be the tribal government. And by doing that, that is a recognition that the intra-tribal dispute was continuing. The goals of the Court and the State were to prevent another armed incursion or another armed invasion or another confrontation at the casino, which endangered residents of the State, which endangered employees of the casino, which endangered tribal members and endangered law enforcement personnel. Our goal was, as the State and the Court's order, I believe, is clear, that the State or what this order did was resolve an issue between the State and the tribe, and that issue was a breach of compact. There's no dispute here whatsoever that the contract was breached. There's no dispute that there was an armed invasion. There is no dispute that the armed invasion endangered the public. Those are factors that were conceded in the Court below. Additionally, as we in our opening or in our answering brief, the position of the State here is that these issues were never truly presented to Judge O'Neill. Judge O'Neill was never asked, please give commonity to this particular trial or a tribal court order. Judge O'Neill was never asked, please defer to this particular tribal court order. Rather, Mr. Matano, counsel for the appellant at the time, the only time that he truly raised anything, said, I'm trying to figure out something. That was in the transcript. And at the end, he doesn't end with, we respectfully request that this court defer to the tribal courts. He ends it by saying, by saying, the point I'm trying to make is that another group invaded the casino two weeks before. Under the circumstances here, Judge O'Neill did not pick out a winner or a loser in the case. He did pick a winner, the State of California. And in doing that, he was enforcing the compact between the State and the tribe. He weighed all the factors that he's required to weigh or to weigh in with respect to a permanent injunction. And under the circumstances here, he did not abuse his discretion, and his judgment should be affirmed. Thank you. Thank you, counsel. Good afternoon. May it please the Court. My name is James Kakunda on behalf of the tribal appellee. Your Honors, what this case boils down to is an individual tribal member or perhaps, as the appellant just acknowledged, perhaps a small group of individual tribal members asking this Court to intervene into internal tribal affairs, invalidate a tribal election, and upend years of governance. The federal courts do not have jurisdiction to grant such relief or take such actions, and for that reason, we ask that this Court, we respectfully request this Court dismiss the appeal and affirm below. Do you think that Judge O'Neill was trying to determine which faction controlled the tribe in his order? No, we do not believe so, Your Honor. The Judge O'Neill below was observing the facts on the ground, and what really what happened was this, the dispute, the intertribal dispute was resolved in a manner consistent with the case law that's been cited in this case, including by appellants, which is first the Department of Interior recognized a tribal government on an interim basis for federal purposes, because as the case law shows, not only was that appropriate, that was actually required of the Department of Interior. Next, the tribe resolved its internal dispute as a matter of tribal law through the ultimate tribal forum, which is an election of the entire adult membership. The Department of Interior then deferred to that internal tribal resolution, as the case law shows, including all of the cases cited by the appellants and appellees here. The National Indian Gaming Commission interprets in the Indian Gaming Regulatory Act as requiring the NIGC to defer to the Department of Interior, and so it did that, which, again, is completely appropriate, and attorney's process and other case law shows is appropriate. That led the NIGC to enter into the reopening agreement and then lift the temporary closure order. The State of California observed all of these facts, observed what the Department of Interior had done and the NIGC, and entered the settlement agreement with the tribe through the elected tribal council and the Clean State election. And finally, the district court simply observed all of those facts and then entered the judgment and permanent injunction. Even if the district court had determined that the – basically made a determination of the tribal government, what it was doing was deferring to the executive branch in the Department of Interior. And again, all of the case law shows that that is appropriate and required. So even if the district court had made that recognition decision, which we believe it didn't, that would have been appropriate and the judgment should still be affirmed. Appellants now want the federal courts to intervene in these matters and recognize a tribal government other than the one that was recognized by the executive branch in the Department of Interior. That actually contradicts all of the case law, and they're actually also doing that without seeking the – without going through the proper mechanism, which is an APA review. If they have a problem with the Department of Interior's decisions, then either they go through the – first they have to go through the agency, exhaust those remedies, and then they seek APA reviews through judicial review. And this Court – Well, excuse me. I'm sorry, counsel. I mean, obviously, he's – since he's appealed, he wants this Court to intervene.  in that Judge O'Neill improperly intervened. That's the argument. We do agree that the issues presented by the appellants here are inconsistent in that they're saying we don't want the federal courts to intervene, but we would also like the federal courts to intervene to invalidate the tribal election and anoint some other government other than the one recognized by the tribe itself and the Department of Interior. And that's another reason why we think this should be – this appeal should be dismissed. This Court has also said that collateral attacks are not appropriate. If they do have a problem with either the NIGC or the Department of Interior's decisions, they have to go through that APA process. The appellants basically – they were basing their request on this purported tribal court, which the appellants portray as undisputed and legitimate, but that is not actually the case. There is no tribal court. The Peking Interantry of Chukchansi Indians does not have a tribal court and has not had one since it reorganized in the 1980s. What they're referring to is one of two purported courts that were created by tribal factions. When, as Mr. Montana referred to, the Ayala faction, the Lewis faction, when they first splintered into two factions, this was about a year or so after the dispute first began, their faction splintered into two, and they both created purported courts, issued conflicting orders, and then, you know, on several third parties, including banks and the Madera County Sheriff. And those were pretty much ignored. At one point, the Ayala faction, which, by the way, should be mentioned, is not the distributees. It's a completely different faction. So we don't think they have standing to even enforce the Ayala factions or seek enforcement of those orders. They did take those to the courts, and they were dismissed. So we think that also that would be they would be barred by arrest due to CADA. Mr. Montana cited Goodface v. Grass Rope and Winnemucca for the proposition that tribal courts can resolve an intertribal dispute. That can be the case in some cases. But in Goodface and in Winnemucca, the courts were very clear to point out that those were undisputed tribal courts that were functioning, and in those cases, even the parties had to the dispute had recognized and acknowledged that the court had jurisdiction and that it was competent to resolve the intertribal dispute. That is the opposite of what happened here. It should also be pointed out that those arguments were made by the Ayala faction to the Department of Interior during this process, during the department's agency process. The Department of Interior looked at both courts because both factions asserted that argument and found that it could not determine which of the factions, if any, that created those courts was the legitimate tribal government, did not have jurisdiction to do so, and therefore could not defer to those tribal courts. Just as the BIA lacked that jurisdiction, the federal courts lacked that jurisdiction as well. And so the federal courts could not defer to that purported court. Again, if the appellants take issue with the department's rejection of their tribal court arguments, they should have gone to the federal court under an APA review, but they cannot collaterally attack it here. It should be mentioned regarding the standing of the appellants because the circumstances have changed. At the very beginning of this appeal, the notice of appeal was filed by the purported tribal council led by Luke Davis. Since then, that tribal council led by Luke Davis, along with all of the other factions, has essentially disbanded and rejoined the tribe. And the tribal council itself, putative tribal council led by Luke Davis, asked this court to dismiss the appeal and first asked their attorney to dismiss the appeal, who did not. Given those change of facts, Mr. Montana is now stating he represents some number of individual tribal members who are within a group of tribal members called the distributees. They call themselves constitutionally recognized to suggest that they have some sort of super status within the tribe, but that is not how this tribe works. All members are equal. The Constitution on its face is very clear about that. So all tribal members are constitutionally recognized. And what's important is that individual tribal members do not have standing to challenge recognition decisions. With regard to standing, the appellants had argued in their briefing that we did not raise that issue below. We take issue with that characterization, but in any case, standing is a jurisdictional issue and can't be waived. I see I'm running out of time, so I would just, if there's no further questions, we believe that there is no relief that this court can grant to the appellants, and for that reason we ask that you dismiss this appeal. Thank you. Thank you, counsel. Thank you, rebuttal. Well, clearly, if Federal courts have jurisdiction to recognize what tribal government they're going to, that's going to be permanent for a tribe, then there's really no need for us to have tribal courts for those issues, internal issues. Well, where did Judge O'Neill do that? Because his injunction is against the tribe, not recognizing any particular faction, as I read it. Well, I mean, my reading is different, Your Honor. Let me cut to the chase a little bit. If we were to reverse this injunction, what effect would it have on the casino? You know, this is not just about the casino. Well, it kind of is as far as the injunction goes. Well, yeah, it is. But, I mean, this is also about a larger picture of tribal court rulings and whether or not they should be followed. I mean, none of those arguments about there being two tribal courts was ever raised in front of Judge O'Neill. I mean, I was there at the hearing in October 2015, and I told him, the tribal court has ruled on this inter-tribal dispute. And he said, well, when was that? And I told him when that was. And he said, well, who's going to enforce it? I said, you will, based on comedy. And he said, why wasn't this brought before me before? And I looked at Mr. Marston, who was an attorney for another group who happened to be here today, and there are still factions, contrary to what he said, and he said, Mr. Marston, what happened? And he said, well, you dismissed it. Well, according to the record, it was a voluntarily dismissal without prejudice. But all through those hearings, subsequent to that, I raised the issue to Judge O'Neill that a tribal court had ruled on the inter-tribal dispute. It should have been remanded back to the tribal court and let them finish out what they needed to do. But the dispute was not over the compact. True. The compact was signed with the State of California between the tribe and the State of California. Correct, but it was used as a vehicle to get to an end, which was to open the casino. And Judge O'Neill was presented with a request for an injunction to shut down the casino and enforce the compact terms between the State of California and the tribe. And he issued that injunction. But as far as I can see, he didn't ever determine as a matter of law what the governing body was of the tribe. He recited historical facts as they were presented to him. But maybe my view is different. But if my view is correct, what's your problem with that? If we say he didn't decide the issue, aren't you happy? Well, then we're right back to where we started from. I mean, we're really back to more clashes, more problems. You know, one faction today holds the compound, which is on trust property. The other faction, this alleged new council, is down in Oakhurst with a building off of trust property outside of Indian Country. I mean, clearly. Are you asking us to decide those questions? Well, I'm asking you to reverse him and say that he had no authority to recognize the new tribal council based on law. And it says clearly in Winnemucca, and I know that's not an uncertain court of appeals case, but it says once a tribal court rules, the BIA and the federal courts are hands off. Well, that's a, you know, we've had recognition cases here before, and there is a process of if you want a relationship, want to be federally recognized, you go through the administrative process. If you don't want to be federally recognized, you don't have to. We're not dealing with a recognition case. We're dealing with a federal court. I'm just saying we have had these kinds of issues in federal court, but they come to us from a different perspective. Well, the only thing I can see is, you know, and I'm an old Indian lawyer who believes in sovereignty and treaty rights, but as an old Indian lawyer who teaches Indian law, I can only see that this is just going to cause more problems. The factionalism is not going to stop because the tribal court rulings are not being upheld by the federal court or not being deferred to. So, I mean, again. But where is that issue presented? I don't see anything in here that argues that Judge O'Neill made a finding that he was not going to defer to the tribal court. It was brought to him. Pardon me? It was brought to him. Even the tribal court decisions were submitted to him. Right. So he didn't say I'm not going to defer. He just said I'm going to put an injunction against the tribe, as far as I can tell. But he's recognizing the vehicle to get to that. He's recognizing the new tribal council. It's very clear. I mean, he cites the new tribal council 20-some times in his opinion. That, to me, tells me that he's recognizing a tribal government permanently based on the ability, based on the compact to get to the opening, reopening of the casino. And contrary to what the appellees say, NIGC, BIA, none of those agencies have the authority to recognize a permanent tribal government. Only a tribal forum can do that, good faith versus grass rope. And then Winnemucca is pretty instructive on that issue. As soon as a tribal court is ruled, it's supposed to be sent back to the tribe. So that's all I have, Your Honors. Okay. Thank you very much. Thank you. Case to start will be submitted for decision, and we will proceed to argument in the case of Hankston v. Nevin. I apologize to the Hankston v. Nevin litigants. I skipped over you. My error.
judges: Fernandez, Thomas, Ezra